## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOLORES BOLTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 18-1655-CFC-SRF |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Dolores Bolton ("Bolton") filed this action on October 24, 2018 against the

defendant Andrew Saul, the Commissioner of the Social Security Administration (the

"Commissioner"). Bolton seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's August 28, 2018 final decision, denying Bolton's claims for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401–434 and §§ 1381–1383f.

Currently before the court are cross-motions for summary judgment filed by Bolton and

the Commissioner.[2] (D.I. 13; D.I. 17) Bolton asks the court to remand her case for further

administrative proceedings. (D.I. 14 at 26) The Commissioner requests the court affirm the

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019 to succeed
Acting Commissioner Nancy A. Berryhill. Pursuant to Federal Rule of Civil Procedure 25(d)
and 42 U.S.C. § 405(g), Andrew Saul was automatically substituted as the Defendant in this
action.

[2] The briefing for the present motions is as follows: Bolton's opening brief (D.I. 14) and the
Commissioner's combined opening brief in support of his motion for summary judgment and
answering brief (D.I. 19). Bolton did not file a reply brief and stands upon her opening brief.
(D.I. 20)

Administrative Law Judge's ("ALJ") decision. (D.I. 19 at 20) For the reasons set forth below, the court recommends denying Bolton's motion for summary judgment (D.I. 13) and granting the Commissioner's cross-motion for summary judgment (D.I. 17).

## II. BACKGROUND

### A. Procedural History

Bolton filed a SSI application and DIB application on September 9, 2014, claiming a disability onset date of March 9, 2012. (D.I. 11-2 at 17; D.I. 11-6 at 2, 9) Her claim was initially denied on October 28, 2014, and denied again after reconsideration on August 5, 2015. (D.I. 11-5 at 6-10, 13-18) Bolton then filed a request for a hearing, which occurred on August 2, 2017. (D.I. 11-2 at 38-69) Administrative Law Judge Howard Prinsloo issued an unfavorable decision, finding that Bolton was not disabled under the Act on August 30, 2017. (*Id.* at 17-29) The Appeals Council subsequently denied Bolton's request for review on August 28, 2018, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-5)

On October 24, 2018, Bolton brought suit in this court challenging the ALJ's decision. (D.I. 2) On May 2, 2019, Bolton filed a motion for summary judgment, and on July 8, 2019, the Commissioner filed a cross-motion for summary judgment. (D.I. 13; D.I. 17)

### B. Medical History

Bolton was born on May 4, 1958 and was 53 years old on her alleged disability onset date. (D.I. 11-6 at 9) Bolton graduated from high school in 1977 and subsequently obtained a culinary art degree from a vocational school in 1978. (D.I. 11-2 at 43; D.I. 11-7 at 37) She has a prior work history as a food service manager[3] at various nursing homes. (D.I. 11-6 at 32-38; D.I.

---

[3] Bolton described her past work as a "food service manager," but the VE and the ALJ characterized such work as a "food service director." (D.I. 11-2 at 44, 63)

11-7 at 37) The ALJ concluded that Bolton had the following severe impairments: degenerative disc disease, degenerative joint disease, and obesity. (D.I. 11-2 at 19)

On November 1, 2011, Bolton visited Dr. Michael J. Ross ("Dr. Ross")[4] for shoulder pain. (D.I. 11-10 at 17-20) Bolton reportedly experienced a pop in her left shoulder while pulling a food cart at work, and subsequently suffered from shoulder pain and swelling. (*Id.* at 17) Dr. Ross noted that Bolton had limited range of motion in her left shoulder and contralateral weakness due to pain. (*Id.* at 18) Dr. Ross was unable to complete a full evaluation of Bolton because of her pain. (*Id.* at 18-20) Three days later, Bolton underwent an MRI of her shoulder, which revealed moderate supraspinatus tendinosis without focal tear and mild subscapularis tendinosis. (*Id.* at 22) On November 8, 2011, Bolton visited Dr. Ross, who administered a subacromial injection in her left shoulder and noted Bolton's increased strength and decreased pain in her shoulder following this procedure. (*Id.* at 12) In a workers' compensation note from the same day, Dr. Ross opined that Bolton had rotator cuff tendonitis and that she was temporarily disabled from employment activities. (*Id.* at 34) On November 16, 2011, Dr. Ross reported that Bolton had initially experienced increased strength and relief from the subacromial injection, but reported increased left shoulder pain and limited range of motion in her left shoulder. (*Id.* at 9) Dr. Ross then administered an ultrasound-guided glenohumeral joint injection and encouraged Bolton to start physical therapy. (*Id.*)

The next day, Bolton began physical therapy with Allison McGlamery, PT ("Ms. McGlamery"). (*Id.* at 40-41) During her first visit and evaluation, Bolton stated that, on a scale of zero to ten, her subjective shoulder pain was ranked at nine at rest and ten during activity.

---

[4] Dr. Ross is a sports medicine physician who Bolton visited at Rothmann Institute. (D.I. 11-10 at 20) Bolton stopped visiting Dr. Ross after she was terminated from her employment in March 2013. (D.I. 11-2 at 47-48)

(*Id.*) Ms. McGlamery found that Bolton was unable to perform many activities including: putting on a button-down shirt, putting on a pullover shirt, washing her face and hands, carrying, and working overhead. (*Id.*) On January 16, 2012, Dr. Ross noted Bolton's continued pain and limited range of motion and cleared Bolton to resume sedentary work. (*Id.* at 7, 30) At a February 9, 2012 physical therapy session, Bolton reported that her pain level was five out of ten during activity. (*Id.*) In an April 4, 2012 physical therapy discharge summary, Ms. McGlamery found that Bolton had regained the ability to wash her face and hands and put on a button-down shirt, but remained unable to put on a pullover shirt, carry, and work overhead. (*Id.*)

On December 7, 2012, Bolton visited Dr. Leo W. Raisis ("Dr. Raisis"),[5] who observed that Bolton could reach behind her head but not behind her waist, and that abduction and internal rotation was painful. (D.I. 11-19 at 43) On the same day, Bolton received a subacromial shoulder injection from Dr. Raisis, who prescribed physical therapy for her shoulder and ordered an MRI. (*Id.*) Dr. Raisis suggested that if Bolton did not respond to conservative treatment, she may be a candidate for left shoulder arthroscopic acromioplasty distal clavicle excision. (*Id.*) On December 15, 2012, Bolton underwent an MRI of her left shoulder. (*Id.* at 47) On January 4, 2013, Dr. Raisis stated that the MRI showed rotator cuff tendinitis and mild arthritis of the acromioclavicular joint, but no signs of rotator cuff tear. (*Id.* at 48) Dr. Raisis also observed that Bolton had improved from the previous shoulder injection and physical therapy. (*Id.*) Dr. Raisis noted that although Bolton may have problems with heavy lifting or using her left arm at shoulder level, she was able to work "full duty." (*Id.* at 48-49)

---

[5] Dr. Raisis is an orthopedic surgeon at First State Orthopaedics. (D.I. 11-2 at 48; D.I. 11-19 at 43)

4

In a January 31, 2013 physical therapy certification letter, Joseph Harnett, PT ("Mr. Harnett") noted that Bolton responded well to physical therapy. (D.I. 11-13 at 2) During a February 22, 2013 appointment with Dr. Raisis, Bolton reported that her left shoulder felt "markedly better" and Dr. Raisis observed that Bolton had "improved significantly" with shoulder injections and physical therapy. (D.I. 11-19 at 52) Dr. Raisis again released Bolton on full duty job status. (*Id.*)

On July 30, 2014, Bolton visited Timothy McHugh, PT ("Mr. McHugh") for chronic pain in her left back and hip, in addition to worsening pain in her left shoulder. (D.I. 11-15 at 31-32) During a physical therapy session with Mr. McHugh on September 10, 2014, Bolton reported severe hip and back pain that restricted her ability to stand up straight to walk. (*Id.* at 22) On September 17, 2014, Bolton was admitted to Christiana Care Medical Center's Emergency Room for blurry vision, dizziness, and lightheadedness. (D.I. 11-17 at 91) The next day, Bolton received a CAT scan and was diagnosed with a transient ischemic attack ("TIA")[6] prior to being discharged. (*Id.* at 92, 94)

On September 24, 2014, Bolton had a follow-up appointment with Dr. Gregory Adams ("Dr. Adams"),[7] who noted that she was suffering from chronic pain in her left shoulder and shoulder joint dysfunction. (D.I. 11-19 at 2-5) Dr. Adams encouraged Bolton to continue physical therapy. (*Id.* at 5) On the same day, Dr. Adams completed a Residual Functional Capacity Evaluation, wherein he concluded that Bolton was unable to lift or carry any weight.

---

[6] A transient ischemic attack ("TIA") produces similar symptoms to a stroke, but lasts only a few minutes and causes no permanent damage. *See Transient Ischemic Attack (TIA)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited Jan. 27, 2020).

[7] Dr. Adams is Bolton's current primary care physician and practices at United Medical Clinic of Delaware. (D.I. 11-2 at 49; D.I. 11-7 at 39)

(D.I. 11-18 at 52) Dr. Adams opined that Bolton could walk no more than ten minutes at a time or a total of eighty minutes in a workday and sit no more than fifteen minutes at a time or a total of 120 minutes in a workday. (*Id.* at 52-53) Dr. Adams noted that Bolton was rarely able to twist, stoop, crouch, climb ladders or stairs, push, pull, reach, manipulate objects, push, or pull. (*Id.* at 53) Furthermore, Dr. Adams reported that Bolton would never need to lie down or elevate her legs at hip level or higher during a workday, but also opined that Bolton would need to take up to eight unscheduled fifteen-minute breaks to lie down and elevate her legs at hip level or higher. (*Id.* at 52) On September 29, 2014, Dr. Raisis found that Bolton had "significant difficulty" reaching behind her head and waist and expressed concerns about secondary degenerative changes. (D.I. 11-19 at 55) Dr. Raisis administered a subacromial injection and encouraged Bolton to continue physical therapy. (*Id.*) On October 20, 2014, Dr. Raisis administered another subacromial injection. (D.I. 11-20 at 26) Dr. Raisis noted that Bolton received conservative treatment and, because of her recent TIA, she was unable to undergo surgery. (*Id.*)

From September 2014 to April 2016, Bolton continued to receive physical therapy from Mr. McHugh. (*Id.* at 2-3; D.I. 11-3 at 3-89) During a September 30, 2014 physical therapy session, Bolton reportedly experienced no relief from the shoulder injection she received and continued to complain of pain and weakness in her shoulder. (D.I. 11-20 at 15) On October 28, 2014, Dr. Michael H. Borek ("Dr. Borek")[8] reviewed Bolton's medical history and concluded that Bolton suffered from the following medically determinable impairments: disorders of muscle, ligament and fascia, obesity, and late effects of cerebrovascular disease. (D.I. 11-4 at 11-13) Based upon Bolton's impairments, Dr. Borek found the following exertional limitations:

---

[8] Dr. Borek is a state agency medical consultant. (D.I. 11-2 at 24; D.I. 11-4 at 11-35)

6

occasional lifting or carrying of fifty pounds, frequent lifting or carrying of twenty-five pounds, standing or walking for a total of six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday. (*Id.* at 14-15) Dr. Borek concluded that Bolton was capable of frequently doing the following: balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ropes, and scaffolds. (*Id.* at 15) Dr. Borek noted Bolton was capable of reaching overhead, except on her left side. (*Id.*) Ultimately, Dr. Borek concluded that Bolton was not disabled, as she was able to perform her past relevant work with these exertional limitations. (*Id.* at 18-19)

On November 17, 2014, Dr. Raisis noted that Bolton was unsure whether physical therapy had improved her condition but reported that the previous injection in her left shoulder helped significantly. (D.I. 11-20 at 20) Dr. Raisis reiterated that surgery may be necessary if Bolton's pain persisted, but she could not be a candidate for surgery due to her recent TIA. (*Id.*) On February 2, 2015, Mr. McHugh observed that Bolton's pain no longer radiated to her thigh. (D.I. 11-3 at 36) Furthermore, she had decreased pain and improved range of motion in her hip. (*Id.*) However, Mr. McHugh noted that Bolton continued to experience pain in her back and hip, which worsened with prolonged walking or standing. (*Id.*) On March 18, 2015, Bolton visited Dr. Raymond M. Wolfe ("Dr. Wolfe")[9] for her continuing shoulder pain. (D.I. 11-20 at 48-51) Dr. Wolfe assessed Bolton with brachial neuritis and thoracic or lumbar radiculitis. (*Id.*) On April 1, 2015, Bolton underwent an MRI of her cervical spine. (*Id.* at 53) On April 17, 2015, Dr. Wolfe reviewed this MRI and referred Bolton to Dr. Christian Fras ("Dr. Fras")[10] for a

---

[9] Dr. Wolfe is an orthopedic surgeon at Premier Orthopaedics. (D.I. 11-2 at 50-51; D.I. 11-20 at 48-51)
[10] Dr. Fras is an orthopedic surgeon at Premier Orthopaedics in Saint Francis Hospital. (D.I. 11-2 at 51; D.I. 11-22 at 46)

7

surgical consultation, noting that Bolton had "failed all other non-operative treatments." (*Id.* at 53-55) On April 29, 2015, Bolton visited Dr. Fras, who noted that despite reported discomfort, Bolton had full strength in her upper extremities and normal gait and station when standing. (D.I. 11-22 at 46) Dr. Fras reviewed Bolton's latest MRI and found degenerative changes, including left-sided disc bulges at the C4-5, C5-6, and C6-7 vertebrae. (*Id.* at 46-47) Dr. Fras referred Bolton for pain management, x-rays, and MRIs of her lumbar spine. (*Id.* at 47)

On May 18, 2015, Bolton saw Dr. Neeraj Kapur ("Dr. Kapur"),[11] for the first time for her persisting neck and back pain. (*Id.* at 2-3) Bolton described a sharp, shooting pain that radiated down her left leg to her heel and was provoked by activity such as bending or prolonged walking. (*Id.*) Dr. Kapur's physical examination found tenderness in Bolton's lumbar spine around the L4-L5 area and cervical spine along C6-C7 midline. (*Id.* at 3) Dr. Kapur diagnosed Bolton with thoracic or lumbosacral neuritis or radiculitis, brachial neuritis, and intervertebral disc disorder with myelopathy. (*Id.*) On July 8, 2015, Bolton described continued pain in her neck and back. (*Id.* at 5-7) On July 13, 2015, Bolton received a cervical epidural steroid injection ("CESI") from Dr. Kapur. (*Id.* at 8-9) On July 28, 2015, at a follow-up appointment with Dr. Kapur, Bolton reported that her pain had been halved following the CESI. (*Id.* at 10-11) On August 5, 2015, upon reconsideration of Bolton's disability application, Dr. Darrin Campo ("Dr. Campo")[12] reviewed Bolton's medical history and concluded that, although she suffered from disorders of muscle, ligament and fascia, obesity, and late effects of cerebrovascular disease, Bolton was not disabled. (D.I. 11-4 at 38-52) On September 16, 2015, Bolton reported continued improvement in her neck and lower back pain. (*Id.* at 13-15)

---

[11] Dr. Kapur is a pain management specialist Bolton is currently seeing for her neck and back pain at Tristate Interventional Pain and Wellness Center. (D.I. 11-2 at 51-52; D.I. 11-7 at 77)
[12] Dr. Campo is a state agency medical consultant. (D.I. 11-2 at 24; D.I. 11-4 at 47-52)

On September 30, 2015, Bolton visited Dr. Wolfe and complained of constant, worsening pain in her lumbar spine that was aggravated by movement. (D.I. 11-21 at 16) Bolton reported numbness and tingling in both legs. (*Id.*) Dr. Wolfe encouraged Bolton to attend physical therapy sessions before obtaining another MRI. (*Id.* at 19) On December 15, 2015, Mr. McHugh informed Dr. Wolfe that Bolton's continued physical therapy provided temporary relief, but her symptoms remained largely unchanged. (D.I. 11-3 at 81) Furthermore, Bolton continued to complain of cervical and lumbar pain of varying intensity that made it difficult to stand up straight, walk, bend, lift, and do housework. (*Id.*)

On January 11, 2016, Bolton received a lumbar epidural steroid injection ("LESI") from Dr. Kapur after an MRI of her lumbar spine. (D.I. 11-22 at 23, 25-26) On January 29, 2016, Bolton visited Dr. Kapur and reported that her pain was halved after the LESI. (*Id.* at 28-29) On February 15, 2016, Bolton received a second LESI. (*Id.* at 30) On March 1, 2016, Bolton told Dr. Kapur her subjective pain continued to improve. (*Id.* at 30-31) On March 14, 2016, Bolton received a third LESI. (*Id.* at 32-33) On April 5, 2016, Bolton saw Dr. Kapur and described her subjective pain as three out of ten. (*Id.* at 34-35) Dr. Kapur observed full strength in Bolton's legs. (*Id.* at 23, 28, 31, 35, 37)

On April 27, 2016, Bolton saw Dr. Fras and reported that she had some temporary relief after the injections, but continued to complain of lower back pain and neck pain. (*Id.* at 52) Bolton was unsure as to whether she would like to proceed with surgery and was referred to Dr. Kapur for continued pain management. (*Id.* at 52-53) On May 4, 2016, Bolton and Dr. Kapur discussed the possibility of future joint injections if her condition did not improve. (*Id.* at 36-37) On July 5, 2016, Bolton visited Dr. Kapur and complained of lower back and neck pain, which continued through November 2016. (*Id.* at 38-45)

On February 1, 2017, Bolton told Dr. Fras that she did not wish to pursue surgery. (*Id.* at 58) On March 28, 2017, Bolton visited Dr. Kapur and reported worsening subjective back pain that was aggravated by walking or bending. (D.I. 11-23 at 4-5) On June 13, 2017, Bolton continued to complain of similar pain and Dr. Kapur scheduled a left medial branch block. (*Id.* at 6-7) On June 19, 2017, Dr. Kapur performed a left medial branch block on Bolton's L2, L3, and L4 vertebrae and a dorsal ramus block on her L5 vertebra. (*Id.* at 8-9) At a July 10, 2017 follow-up appointment with Dr. Kapur, Bolton reported that the medial branch block procedure had not been effective and that she did not experience relief from her severe lower back pain. (*Id.* at 12-13)

On June 2, 2017, Bolton saw Jeffrey Vari, PT ("Mr. Vari") for a functional capacity evaluation. (*Id.* at 15-21) Mr. Vari opined that during an eight-hour workday, Bolton could perform sedentary work for less than two hours. (*Id.* at 20) Furthermore, Mr. Vari concluded that Bolton could not crouch, squat, stoop, or forward bend, and can only occasionally sit, stand, and walk. (*Id.* at 16) Bolton was able to use her hands constantly for simple tasks and was able to reach frequently. (*Id.*) Mr. Vari noted that he could not attain an accurate and reliable assessment of Bolton's functional capacity because of Bolton's inconsistent effort and non-organic signs of pain. (*Id.* at 21)

### C. Hearing Before ALJ Prinsloo

#### 1. Bolton's Testimony

Bolton testified that she lives at home with her husband, sister, and great-nephew. (D.I. 11-2 at 44) Bolton testified that she worked for fifteen years as a food service manager for Genesis Health Corporation, where she cooked and served food, maintained the kitchen, and unloaded food deliveries. (*Id.* at 44-45) Bolton stated that as she pulled a food cart up a ramp at

work, her left shoulder popped. (*Id.* at 47) She immediately went to a hospital, where she was referred to Rothman Institute. (*Id.*) Bolton testified that Dr. Ross told her she had a tear in her shoulder, placed her arm in a sling, and referred her to physical therapy for treatment. (*Id.* at 47-48) Bolton stated that during this time, she "sat on a desk" for six months at work and was subsequently terminated. (*Id.* at 46) Bolton testified that she believes that her employment was terminated due to her inability to do the required "constant lifting, standing, pushing" necessary for her position. (*Id.* at 61-62) Bolton explained that she was initially treated by Dr. Ross through her work, but had to find another doctor after the termination of her employment. (*Id.* at 48) She subsequently treated with Dr. Raisis. (*Id.*) Bolton stated that Dr. Adams is her current family doctor who has referred her to several specialists. (*Id.* at 49)

Bolton testified that she needs help doing household chores, showering, cooking, combing her hair, and shopping. (*Id.* at 54-55, 57) Bolton stated that she only drives in emergencies and mainly relies on her husband as her driver. (*Id.* at 55-56) On some days, she does not leave her room because of her pain and depression. (*Id.* at 58) Bolton testified that she has trouble sleeping at night, and often naps for approximately half of the day. (*Id.* at 58-59) Bolton stated that she does not think she can go back to her previous job because she cannot lift weights, bend, or twist despite her best efforts. (*Id.* at 57) When Bolton attempted to perform activities during a functional capacity evaluation, her pain prevented her from completing any of the activities she previously did routinely, such as lifting weights, bending, and twisting. (*Id.*)

## 2. Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

I want you to begin by assuming that you're dealing with an individual who's the same age as the claimant. So she was 53 at her onset date. She's now 59 with the same high school educational background and the same past work experience. I want you to assume that this individual retains the residual functional capacity for medium work that would be limited to only occasionally [*sic*] overhead reaching with the left upper extremity. How would that affect the ability to perform the past work?

(*Id.* at 63) The VE testified that this individual would be able to perform the past work of a food service director at the light exertional level, but not as actually performed at the heavy exertional level. (*Id.*) The ALJ then inquired how a limitation of only frequent climbing, balancing, stooping, kneeling, crouching, or crawling would affect the individual's ability to perform past work. (*Id.* at 63-64) The VE testified that the individual would be able to perform past work at the light exertional level as described in the DOT, but not as actually performed at the heavy exertional level. (*Id.* at 64) The ALJ asked whether an RFC of light work and the previous postural and reaching restrictions would affect the ability to perform past work. (*Id.*) The VE testified that the individual would be able to perform past work at the light exertional level as described in the DOT, but not as actually performed at the heavy exertional level. (*Id.*)

The ALJ inquired whether there were any transferrable skills from the hypothetical individual's past work. (*Id.*) The VE testified that the individual had the following transferrable skills: managing food service, ordering, supervising workers, stocking, and inventory. (*Id.*) The VE testified that these transferrable skills would allow the individual to perform light skilled work as a food concession manager, restaurant manager, and food service manager. (*Id.*) The VE testified that there would be no transferable skills to sedentary jobs. (*Id.* at 65) The VE also noted that the DOT characterized the exertional level of Bolton's previous job of food service

director as the light exertional level, but was typically performed in the economy at the medium exertional level and may vary by employer. (*Id.* at 66-67)

## D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Bolton and the VE, the

ALJ determined that Bolton was not disabled under the Social Security Act for the relevant time

period of March 9, 2012, the alleged onset date of the disability, through August 30, 2017, the

date of the decision. (D.I. 11-2 at 28-29) The ALJ found in pertinent part:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since March 9, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease; degenerative joint disease; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following limitations: the claimant is limited to only frequent climbing, balancing, stooping, kneeling, crouching, and crawling. Additionally, the claimant is limited to only occasional overhead reaching with the left upper extremity.

6.  The claimant is capable of performing past relevant work as a food service director. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Id.* at 19-29)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain

14

and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

The core issue in this case is whether Bolton was disabled within the meaning of the Act at any time from March 9, 2012, the alleged onset date, through the date of the ALJ's decision, August 30, 2017. (D.I. 11-2 at 28-29) Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was

disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv),

416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On August 30, 2017, the ALJ found that Bolton was not disabled from the alleged disability onset date of March 9, 2012, through the date of the ALJ's decision. (D.I. 11-2 at 28) The ALJ concluded that, despite Bolton's severe impairments (degenerative disc disease, degenerative joint disease, and obesity), Bolton had the RFC to perform work at the medium exertional level with the following limitations: frequent climbing, balancing, stooping, kneeling, crouching and crawling, and occasional overhead reaching with the left upper extremity. (*Id.* at 19, 21) The ALJ determined that Bolton was capable of performing past relevant work as a food

17

service director because the work did not involve performance precluded by Bolton's RFC. (*Id.*
at 28) Bolton asserts three main arguments on appeal: (1) the ALJ failed to provide adequate
reasons for affording Dr. Adams' medical opinion "little weight" and the ALJ's RFC finding was
therefore inaccurate; (2) the ALJ erred when he failed to recontact Dr. Adams in order to address
inconsistencies in his medical opinion, and (3) the ALJ's credibility assessment of Bolton is
flawed because the ALJ failed to consider plaintiff's lengthy work history. (D.I. 14 at 2-26)

## 1. The ALJ Properly Evaluated Medical Opinion Evidence

Bolton argues that the ALJ failed to provide adequate reasons for assigning the opinion of
Bolton's primary treating physician, Dr. Adams, "little weight." (*Id.* at 6) Specifically, Bolton
contends that the ALJ failed to consider all the relevant factors outlined in 20 C.F.R. §
404.1527[13] when assigning weight to the treating physician's opinion. (*Id.*) These factors
include: examining relationship, treatment relationship, supportability, consistency,
specialization, and other factors such as the extent to which the medical source is familiar with
other information in the case. *See* 20 C.F.R. § 404.1527(c); SSR 96-2p.[14] Bolton also suggests
that the ALJ misunderstood the chronology of Bolton's medical history and relied on his own lay
judgment in affording Dr. Adams' opinion little weight. (D.I. 14 at 9, 11-12)

Although the findings and opinions of treating physicians are entitled to substantial
weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on
the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir.
2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Instead, the

---

[13] Defendant concedes that because plaintiff filed her disability applications before March 27,
2017, 20 C.F.R. § 404.1527 is applicable. (D.I. 19 at 12 n.7)

[14] SSR 96-2p was rescinded on March 27, 2017. However, SSR 96-2p is applicable because
Bolton's claim was filed before March 27, 2017. *See* SSR 96-2p.

18

determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). Moreover, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with other substantial evidence in [the] case record.'" *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). It is not for the court to re-weigh the medical opinions in the record, but rather to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

In determining an individual's RFC, the ALJ is "free to accept some medical evidence and reject other evidence" so long as she "provides an explanation for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). The ALJ may also reject a treating physician's opinion outright based on contrary medical evidence and may assign a "treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (quoting *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)).

Bolton argues that the ALJ erred by erroneously asserting that Dr. Adams' assessment of Bolton's limitations was contradicted one month later by Dr. Raisis' observations of significant improvement. (D.I. 14 at 11-12; D.I. 11-2 at 26) Bolton accurately notes that the ALJ misstated the chronology of these events. (D.I. 14 at 11-12) Dr. Raisis noted that Bolton improved significantly on February 22, 2013, approximately nineteen months before Dr. Adams' assessment on September 24, 2014. (D.I. 11-2 at 27; D.I. 11-18 at 52-53; D.I. 11-19 at 52) On September 29, 2014, five days after Dr. Adams' disability assessment, Bolton saw Dr. Raisis, who observed that Bolton was "significantly" pained by her left shoulder and had difficulty

reaching behind her head and waist. (D.I. 11-19 at 55) Dr. Raisis noted concern about degenerative changes in Bolton's shoulder, prescribed another shoulder injection, and recommended additional physical therapy sessions. (*Id.*)

Although the ALJ misstated the chronology of Dr. Raisis' remarks regarding Bolton's improvement, substantial evidence supports the ALJ's decision to afford Dr. Adam's opinion "little weight." The ALJ noted that the lapse in treatment for Bolton's shoulder from January 2013[15] to July 2014 indicates that Bolton's alleged disabling impairments are unsupported by the record. (*Id.* at 52; D.I. 11-2 at 27) Furthermore, the ALJ considered all relevant factors in determining how much weight to afford Dr. Adams' opinion that Bolton was disabled from left shoulder pain and dysfunction. The ALJ explained that although Dr. Adams was a treatment provider, the majority of Bolton's treatment was performed through Dr. Wolfe, Dr. Kapur, and Dr. Fras, who had more specialized expertise and treated Bolton more frequently for her alleged impairments. (D.I. 11-2 at 26) The ALJ observed that Dr. Adams' medical opinion that Bolton was unable to lift or carry any weight was contradicted by the record. (*Id.*) Specifically, the ALJ noted Dr. Wolfe's and Dr. Fras' physical examinations found normal sensation and strength in Bolton's bilateral upper extremities on multiple occasions. (*Id.*; D.I. 11-20 at 50; D.I. 11-21 at 22; D.I. 11-22 at 46-47) Moreover, the ALJ explained that Dr. Raisis' review of Bolton's imaging studies indicating no rotator cuff tear and only mild degenerative changes contradicted Dr. Adams' opinion. (D.I. 11-2 at 26; D.I. 11-19 at 43) Furthermore, the ALJ concluded that Dr. Adams' disability assessment of Bolton was inconsistent with his own findings. (D.I. 11-2 at 26) Specifically, on September 9, 2014, Dr. Adams stated that in an eight-hour workday, Bolton

---

[15] The ALJ notes that Dr. Raisis' last appointment with Bolton in 2013 was in January. (D.I. 11-2 at 27) However, Bolton visited Dr. Raisis in February 2013, when Dr. Raisis stated that he would see Bolton as needed. (D.I. 11-19 at 52)

20

did not need to lie down or elevate her legs but, in the same assessment, opined that Bolton would need eight unscheduled breaks throughout the day to lie down and elevate her legs. (D.I. 11-2 at 26-27; D.I. 11-18 at 52-53) Bolton argues that this observation is evidence of the ALJ impermissibly substituting his lay opinion for that of Dr. Adams. (D.I. 14 at 9) To the contrary, the ALJ pointed out an inconsistency in Dr. Adams' record which is undisputed.

Bolton also argues that the ALJ erred by assigning the medical opinions of state agency medical consultants, Dr. Borek and Dr. Campo, greater weight than Dr. Adams' opinion because they were non-treating opinion sources and did not have access to Bolton's most recent medical history. (D.I. 14 at 13-14) However, the ALJ considered all appropriate factors in affording "some weight" to the state agency consultants' medical opinions. (D.I. 11-2 at 25) The ALJ acknowledged that Dr. Borek and Dr. Campo were non-examining sources, but also noted that they had access to all available evidence of Bolton's medical history at the time they formed their opinion and appropriately afforded them "some weight." (*Id.*) Furthermore, the ALJ noted that Dr. Borek and Dr. Campo had a high level of understanding of the Social Security Disability program. (*Id.*) The ALJ observed that Dr. Borek and Dr. Campo's opinions were supported by the record. (*Id.*) For example, imaging studies of Bolton's left shoulder, lumbar spine, and cervical spine consistently showed mild degenerative changes, in accordance with Dr. Borek and Dr. Campo's opinions. (*Id.*; D.I. 11-19 at 43, 77-79; D.I. 11-20 at 40-41; D.I. 11-21 at 13; D.I. 11-22 at 46-47) Moreover, the ALJ considered the lack of documentation suggesting significant or worsening symptoms necessitating surgical intervention. (D.I. 11-2 at 25) Additionally, physical exams showing normal strength and sensation in Bolton's extremities further supported the moderate exertional and postural limitations suggested by Dr. Borek and Dr. Campo. (*Id.*;

D.I. 11-20 at 25) Therefore, substantial evidence supports the ALJ's findings that the state agency medical consultants' opinions were entitled to "some weight."

Bolton asserts that the ALJ erroneously assigned Dr. Raisis' medical opinion "great weight" because his opinion that Bolton was cleared for work release due to shoulder improvement was outdated, less detailed, and based on Bolton's self-reporting. (D.I. 14 at 14-15) Therefore, Bolton concludes, all of the 20 C.F.R. § 404.1527(c) factors except specialization should result in giving greater weight to Dr. Adams' opinion. (*Id.* at 14) The ALJ acknowledged that Dr. Raisis had examined Bolton firsthand and observed her imaging studies as a primary treating source who is familiar with Bolton and her medical history. (D.I. 11-2 at 26-27) *See also* 20 C.F.R. § 404.1527(c)(1)-(2). The ALJ noted that Dr. Raisis' opinion approving Bolton for work release was supported by evidence in the record. (D.I. 11-2 at 27) *See also* 20 C.F.R. § 404.1527(c)(3)). For example, the imaging of Bolton's shoulder revealed only minor degenerative changes, Bolton was able to reach behind her head and waist, and Bolton self-reported improvement, therefore, supporting Dr. Raisis' opinion. (D.I. 11-2 at 26-27; D.I. 11-19 at 43) Moreover, the ALJ concluded that, as an orthopedist, Dr. Raisis has specialized training and medical knowledge to treat and assess Bolton's shoulder impairment, unlike Dr. Adams. (D.I. 11-2 at 26-27) *See also* 20 C.F.R. § 404.1527(c)(5).

Therefore, substantial evidence supports the ALJ's evaluation that Dr. Adams' opinion should be afforded "little weight."

## 2. The ALJ Did Not Err in Failing To Recontact Dr. Adams Regarding Inconsistencies in His Opinion

Bolton further argues that the ALJ erred when he failed to recontact Dr. Adams in order to address inconsistencies pursuant to 20 C.F.R. § 404.1520b. (D.I. 14 at 13, 15) *See* 20 C.F.R. § 404.1520b. Bolton acknowledges that the method by which the ALJ addresses an ambiguity or

22

deficiency is discretionary but argues that the ALJ failed to address the alleged insufficiencies and inconsistencies in the record. (D.I. 14 at 13, 15)

20 C.F.R. § 404.1520b(b)(2) states that "[i]f the evidence is *consistent* but we have *insufficient* evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled . . . [w]e *may* recontact your medical source." 20 C.F.R. § 404.1520b(b)(2) (emphasis added). In the case of inconsistencies in the case record, "we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 404.1520b(b)(1).

Here, the ALJ weighed Dr. Adams' inconsistent medical opinion against his own contemporaneous medical treatment notes and against inconsistencies in the record. (D.I. 11-2 at 26) The ALJ consequently afforded Dr. Adams' opinion little weight based on its inconsistency with the record. (*Id.*) Because the evidence was sufficient but inconsistent, the ALJ was required to weigh the evidence presented. *See Campbell v. Colvin*, 2016 WL 4503341, at *3 (W.D. Pa. Aug. 29, 2016) ("An ALJ may only consider recontacting a treating physician, where the evidence is consistent but there is insufficient evidence to determine whether a claimant is disabled or after weighing the evidence the ALJ cannot reach a conclusion about whether a claimant is disabled. The ALJ, however, is not obligated to do so.") (internal citations omitted). Furthermore, even if 20 C.F.R. § 404.1520b(b)(2) were applicable, the ALJ is not required to recontact medical sources but such action is discretionary. *See id.* Therefore, the ALJ did not err in failing to recontact Dr. Adams.

### 3. The ALJ Properly Acknowledged Bolton's Work History

Bolton argues that the ALJ did not adequately consider her long work history when assessing her subjective symptoms of pain. (D.I. 14 at 24-26) Bolton states that her twenty-nine years of uninterrupted earnings from 1984 to 2012 bolster her credibility. (*Id.*) The Third Circuit has held that an individual may be entitled to consideration of their long work history in the assessment of their credibility of symptoms. *See Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). However, an ALJ is "not required to equate a long work history with enhanced credibility," particularly if the claimed symptoms do not match the evidence of record. *Passaretti v. Colvin*, 2015 WL 5697510, at *10 (M.D. Pa. Sept. 24, 2015) (citing *Birtig v. Colvin*, 2014 WL 5410645, at *10 (W.D. Pa. Oct. 23, 2014)).

Here, the ALJ did not err in failing to expressly consider Bolton's extensive work history because he concluded that Bolton's complaints did not match the evidence of record. (D.I. 11-2 at 27) For example, ALJ noted that Bolton had received generally conservative treatment in the form of medication and physical and injection therapies, without the need for surgical intervention. (*Id.*) The ALJ observed that medical imaging in the record showed only mild to moderate degenerative changes in Bolton's shoulder, neck, and back, thereby undermining the alleged severity of her claimed impairments. (*Id.*) The ALJ also stated that he gave Bolton "the benefit of every possible doubt and credit[ed] her testimony to the extent that it was consistent with the medical evidence," but found that her allegations regarding functional limitations "are not supported by the evidence as a whole." (*Id.*) Thus, the ALJ did not err in failing to find Bolton deserved "enhanced credibility" based on her work record.

## V. CONCLUSION

For the foregoing reasons, the court recommends denying Bolton's motion for summary judgment (D.I. 13) and granting the Commissioner's cross-motion for summary judgment (D.I. 17).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*); Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: January **28**, 2020

Sherry R. Fallon
United States Magistrate Judge